Filed 7/8/26  Cal. Institute for Human Science v. Myo-Sei CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA INSTITUTE FOR HUMAN SCIENCE, | D085292 |
| Plaintiff and Appellant, | (Super. Ct. No. 37-2024-00004604-CU-MC-CTL) |
| v. | |
| MYO-SEI, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Liebert Cassidy Whitmore, Max S. Sank, Duncan H. Dohmen; Williams Iagman, and Jon R. Williams, for Plaintiff and Appellant.

 Glaser Weil Fink Howard Jordan & Shapiro,  Alex G. Brizolis, Elizabeth G. Chilton; Procopio Cory Hargreaves & Savitch and Kevin M. Davis, for Defendant and Respondent.

## I. INTRODUCTION

The California Institute for Human Science (CIHS) sued Myo-Sei, Inc. (Myo-Sei), seeking declaratory relief regarding leases and purchase options

between the parties.  Myo-Sei demurred to all six causes of action in CIHS's first amended complaint, which the trial court sustained without leave to amend.  On appeal, CIHS challenges that ruling as to four causes of action. We find the first two causes of action barred by the statute of limitations, while the fourth and fifth fail to state valid claims for relief.  Further, we see no abuse of discretion in the trial court's denial of leave to amend.  We therefore affirm.

## II. BACKGROUND[1]

### A.    *The Parties*

CIHS is a Californian nonprofit public benefit corporation operating a graduate school and research center in Encinitas.  Hiroshi Motoyama (Motoyama) incorporated CIHS and served on its board of directors from 1992 to 2015.[2]

Tamamitsu Jinja (Jinja) is a Japanese religious corporation. Motoyama served as Jinja's head priest through 2013.

Myo-Sei is a California for-profit, stock corporation.  Jinja is Myo-Sei's sole owner.

### B.    *The Properties*

Jinja owned real property in Encinitas consisting of three lots numbered 13, 14 and 15.  Jinja developed that property in two phases.  In 1996, Jinja constructed a 10,000 square foot school building on Lot 15 and a

---

1    Because we are reviewing the trial court's ruling on a demurrer, our factual background is based on the operative complaint's allegations and exhibits, as well as matters judicially noticed by the trial court.  (*Genis v. Schainbaum* (2021) 66 Cal.App.5th 1007, 1015 (*Genis*).)

2    Motoyama died in 2015.  His son then assumed the duties as Jinja's head priest.

parking lot on Lot 14.  The address of the building on Lot 15 is 701 Garden View Court (701 Property).

In 1999, Jinja built a 10,000 square foot educational and research building on Lot 14.  Jinja retained some of the parking spaces on Lot 14, and built an additional parking lot on Lot 13.  The address of Lots 13 and 14 is 741 Garden View Court (741 Property).

## C.    *The Disputed Transactions*

In 1998, Jinja leased the 701 Property to CIHS for one dollar a year for 50 years (701 Lease).  The lease prohibited CIHS from subleasing the property without Jinja's prior written consent.  The lease also included an option for CIHS to buy the 701 Property, exercisable during the six months prior to the end of the lease (701 Option).  CIHS paid 10 dollars for the 701 Option and had to pay an additional 10 dollars to exercise it.

In 1999, Jinja transferred the 701 and 741 Properties, including the 701 Lease, to Myo-Sei.  That same year, Myo-Sei leased the 741 Property to CIHS (741 Lease).  Like the 701 lease, the rent for the 741 Lease was one dollar a year for fifty years, subleasing required Myo-Sei's prior written consent, and CIHS paid 10 dollars for the option to purchase the 741 Property for an additional 10 dollars at the end of the lease's term (741 Option).

The 741 Lease also included a section requiring CIHS to adhere to eight principles (Principles).[3]  Compliance with the Principles was to be reviewed by Myo-Sei every five years with CIHS's assistance.  If CIHS failed to comply with the Principles, Myo-Sei had the right to terminate the 741 Lease.

Also in 1999, Myo-Sei and CIHS amended the 701 Lease to include the same Principles provisions that were in the 741 Lease (First 701 Lease Amendment).  Motoyama executed the First 701 Lease Amendment on behalf of both Myo-Sei and CIHS.

In 2006, Myo-Sei and CIHS amended the 741 Lease (741 Lease Amendment).  That amendment terminated the 741 Option.  It further stated that once CIHS became financially independent, the 741 Lease shall terminate.  Motoyama executed the 741 Lease Amendment on behalf of both Myo-Sei and CIHS.

The parties also amended the 701 Lease in 2006 (Second 701 Lease Amendment).  This amendment identified the "Leased Premises" as the 701 Property, which was depicted as Lot 15 in an attached diagram.  The

---

[3]     The Principles as set out in the 741 Lease are:  (1) "to promote a society which enhances the integration of science and religion;" (2) "to understand human existence from the total perspective of body, mind and spirit;" (3) "to establish guiding principles for citizens of the global society;" (4) "to establish energy medicine, which will prevent diseases and promote health;" (5) "to elucidate the mechanism of the correlation between mind and body, and to actualize mental control over body and matter with a resulting better life;" (6) "to systematize scientific and objective meditational practices, which will promote spiritual growth;" (7) "to establish a society which satisfies both the individuality (freedom and rights) and sociality (morality and coexistence) of human existence;" and (8) "to establish a creative science which researches the mind and soul as well as matter."

4

Second 701 Lease Amendment also specified which parking spaces CIHS could use if it exercised the 701 Option or the 741 Lease was terminated.

In 2016, as part of its effort to become an accredited college, CIHS established a new governing board so that any Jinja-affiliated board members would be in the minority. At its first meeting in 2016, the new board amended CIHS's bylaws. The amended bylaws included an article titled "Reserve Powers," which addresses compliance with the leases, specifically referencing both the 741 Lease Amendment and the First 701 Lease Amendment.

The Reserve Powers state that every five years, CIHS is required to deliver to Jinja reports regarding CIHS's financial status, Principles adherence, and subtenant compliance. In consultation with the CIHS board, Jinja would then determine whether CIHS is financially independent enough for termination of the 741 Lease, and whether CIHS's failure to comply with the Principles warranted termination of the 701 Lease or the 741 Lease. The Reserve Powers were renumbered without substantive change in a 2021 amendment to the bylaws.

Pursuant to the Reserve Powers, Jinja emailed the CIHS board on December 28, 2023, asking for a Principle adherence and financial report. Then, on January 8, 2024, Myo-Sei wrote a letter to CIHS demanding acknowledgement that CIHS was bound by and intends to comply with the leases as currently written, and that CIHS will seek written approval for subleases.

On March 31, 2024, Myo-Sei sent CIHS two notices to cure, one for each lease. Those notices stated that CIHS was in default on both leases for noncompliance with the Principles and failing to assist Myo-Sei in making

5

that termination.  The notices gave CIHS 15 days to cure, indicating that failure to do so could result in termination of the leases.

### D.    Trial Court Proceedings

On January 31, 2024, CIHS sued Myo-Sei for declaratory and injunctive relief.  Myo-Sei demurred, and before the trial court heard the demurrer, CIHS filed a first amended complaint (FAC).  The FAC is the operative complaint.[4]  It contains six causes of action for declaratory relief: (1) the First 701 Lease Amendment is void and unenforceable; (2) the 741 Lease Amendment is void and unenforceable; (3) Myo-Sei has no right to make any determination on CIHS's Principles compliance; (4) Myo-Sei has no right to require prior written consent to CIHS's subleases; (5) CIHS has an irrevocable option to purchase the 701 and 741 Properties; and (6) the Reserve Powers are void and unenforceable.[5]

In its first two causes of action, CIHS alleged that the First 701 Lease Amendment and the 741 Lease Amendment are void because they are unconscionable, invalid, and the product of conflicts of interest, self-dealing, and undue influence.  CIHS alleged that Motoyama signed the leases on behalf of both parties, the other CIHS directors involved were affiliated with

---

[4]    The 701 Lease, the First 701 Lease Amendment, the 741 Lease, and the 741 Lease Amendment are attached to the FAC as exhibits.  The trial court took judicial notice of the Second 701 Lease Amendment; the parties do not challenge that ruling in this appeal.

[5]    CIHS states in its opening brief that it is not challenging the trial court's ruling on the sixth cause of action.  Further, CIHS forfeited any claim regarding the third cause of action by not addressing that cause of action in its briefing.  (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 352.)  We therefore limit our review to the first, second, fourth, and fifth causes of action.

6

Jinja and Myo-Sei, there was no independent representation of CIHS, CIHS did not receive valuable consideration, and Jinja and Myo-Sei intended the original leases to be irrevocable gifts for which they received tax benefits.

Under its fourth cause of action, CIHS alleged that prior to 2024, it had continuously and openly subleased portions of the 701 and 741 Properties without objection from Myo-Sei. CIHS also claimed that prior subleasing consent was inconsistent with the introductory provisions of the 741 Lease. CIHS further alleged that during a CIHS board meeting that occurred before the 741 Lease's execution, Myo-Sei agreed that CIHS could sublease the property. On these grounds, CIHS contended that Myo-Sei waived its right to prior written subleasing consent for both properties and sought a declaration that said right no longer existed.

In the fifth cause of action, CIHS sought a declaration that the 701 Option applied to the entire CIHS campus (the 701 Property and the 741 Property), which CIHS identified as Lot 22. CIHS alleged that in 1995, Jinja consolidated Lots 14 and 15 creating Lot 20, and in 1998, Jinja consolidated Lot 20 with Lot 13, creating Lot 22. CIHS claimed that the parties intended for the 701 Option to cover Lot 22 because the First 701 Lease Amendment identifies the lot in question as Lot 22.

Myo-Sei demurred to the FAC, which the trial court sustained without leave to amend. The trial court found that the first, second, and sixth causes action were barred by the statute of limitations, rendering the fifth cause of action moot. The trial court determined that the third and fourth causes of action failed because they sought prospective waivers of continuing covenants.

Based on this ruling, the trial court entered judgment in Myo-Sei's favor on October 21, 2024. CIHS timely appealed.

7

## III. DISCUSSION

### A. *The Trial Court Properly Sustained the Demurrer*

#### 1. <u>Standard of Review</u>

"An order sustaining a demurrer without leave to amend is reviewed de novo. The court exercises its independent judgment to determine whether or not the complaint states facts sufficient to constitute a cause of action as a matter of law. [Citation.] We assume the truth of properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and matters that are judicially noticeable. [Citation.] We construe the pleading in a reasonable manner and read the allegations in context. [Citation.] However, … [w]here facts appearing in attached exhibits or judicially noticed documents contradict, or are inconsistent with, the complaint's allegations, we must rely on the facts in the exhibits and judicially noticed documents." (*Genis, supra,* 66 Cal.App.5th at pp. 1014–1015.)

#### 2. <u>First and Second Causes of Action</u>

CIHS argues that the wrongful conduct giving rise to the first and second causes of action is Myo-Sei's attempted enforcement of the disputed lease provisions in 2023 and 2024. CIHS argues that these enforcement efforts were the first time CIHS suffered appreciable harm from Myo-Sei's conduct, and that they constituted breaches of contract and the implied covenants of quiet enjoyment and good faith and fair dealing. CIHS further contends that the 741 Lease Amendment was an anticipatory breach of the 741 Option, which it could seek to enforce in the future when the 741 Option matured. Finally, CIHS claims that a cause of action based on contract formation defenses does not expire in the face of a present attempt at contract enforcement. We disagree.

8

### a. Statutes of Limitations and Accrual

"A claim for declaratory relief is subject to the same statute of limitations as the legal or equitable claim on which it is based." (*Bank of New York Mellon v. Citibank, N.A.* (2017) 8 Cal.App.5th 935, 943.) "To determine which statute of limitations applies to a particular action, we consider the 'gravamen' of the action rather than its form or the relief demanded. [Citation.] The gravamen of an action depends on the nature of the right sued upon or the principal purpose of the action." (*Ibid.*)

" 'As a general rule, a statute of limitations accrues when the act occurs which gives rise to the claim [citation], that is, when "the plaintiff sustains actual and appreciable harm. [Citation.] Any 'manifest and palpable' injury will commence the statutory period." ' " (*Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1195–1196 (*Costa*).) Stated differently, " 'a cause of action accrues at "the time when the cause of action is complete with all its elements" ' " and " 'the statute of limitations runs from "the occurrence of the last element essential to the cause of action." ' " (*JPMorgan Chase Bank, N.A. v. Ward* (2019) 33 Cal.App.5th 678, 687.)

However, limitations periods may be tolled. For example, under the adverse domination doctrine, tolling may occur when corporate wrongdoers control the corporation and prevent discovery of their malfeasance. (*Smith v. Superior Court* (1990) 217 Cal.App.3d 950, 954.)

### b. Analysis

Myo-Sei's 2023 and 2024 contract enforcement attempts demonstrate that there is an actual controversy, which is required for declaratory relief actions. (Code Civ. Proc., § 1060.) But contrary to CIHS's claims, Myo-Sei's

recent enforcement attempts are not the wrongs upon which first and second causes of action are premised.

Instead, the first and second causes of action seek a declaration that the First 701 Lease Amendment and the 741 Lease Amendment are void based on the circumstances surrounding their creation. Accordingly, the gravamen of these causes of action is cancellation of written instruments. The longest potential statute of limitations for these claims is four years. (See, e.g., *Costa, supra,* 175 Cal.App.4th at p. 1195 ["the four-year limitations period of [Code of Civil Procedure] section 343 has been applied to claims seeking to set aside all kinds of instruments for a variety of reasons."].)

Moving to accrual, the various grounds alleged for cancellation of the amendments (unconscionability, conflicts of interest, self-dealing, undue influence, lack of consideration, and irrevocability) existed when the amendments were executed. For example, to the extent there was a conflict of interest or self-dealing, those wrongs were complete once the amendments were signed. The FAC appears to acknowledge this, alleging that both amendments were "unconscionable at the time [they were] made," and that the "transaction[s were] not fair and reasonable to CIHS at the time [they were] entered into."

Further, CIHS sustained significant losses upon the amendments' execution. Under the original terms of the 741 Lease, CIHS had the right to rent a 10,000 square foot building for one dollar a year for 50 years. CIHS also had the right to purchase that building for 10 dollars at the end of the lease term. As the 741 Lease acknowledges, these are "generous terms." And the FAC recognizes the value of these rights as well; describing the option as "highly favorable" and the lease as "extremely valuable." The FAC further alleges, "The opportunity for a non-profit organization to obtain such a

10

valuable asset in Southern California was and is extremely vital to the future success of CIHS."

Similarly, the original 701 Lease had the "generous terms" of allowing CIHS to rent a 10,000 square foot building for one dollar a year for 50 years. The FAC described this right as "highly valuable."

Based on the allegedly wrongful actions leading to the 741 Lease Amendment, CIHS lost its "highly favorable" option to purchase the 741 Property. This was a manifest and palpable injury, which CIHS incurred as soon as the 741 Lease Amendment was executed. Likewise, upon the alleged improper creation of the First 701 Lease Amendment and the 741 Lease Amendment, CIHS suffered actual an appreciable harm to its "extremely valuable" leasing rights. Pursuant to those amendments, CIHS had to align itself with the Principles and avoid financial independence or risk termination of the leases. Indeed, these injuries are the premise of CIHS's claims that the amendments were substantively unconscionable at the time they were made.

Under these circumstances, CIHS's causes of action were complete, and the statute of limitations began to run, when the First 701 Lease Amendment was executed in 1999, and when the 741 Lease Amendment was executed in 2006. Pursuant to the allegations in the FAC, CIHS could rely on tolling under the adverse domination doctrine because Jinja affiliates controlled CIHS at the time the amendments were executed. However, that doctrine no longer applied after 2016, which is when CIHS alleges that independent directors obtained control of CIHS. Those independent directors adopted the 2016 amendment to CIHS's bylaws, which included the Reserve Powers. The Reserve Powers not only referenced the First 701 Lease Amendment and the 741 Lease Amendment but also clarified how CIHS was to comply with their

11

terms. CIHS's independent directors therefore ratified the lease amendments in their 2016 bylaws.

Consequently, the latest potential time the first and second causes of action began to accrue was in 2016. CIHS filed its first complaint in 2024, much more than 4 years later. The first and second causes of action are therefore barred by the statute of limitations. CIHS agrees with this reasoning, acknowledging in its reply brief that "any cause of action to rescind or cancel the amendments accrued upon execution and (assuming tolling until CIHS formed an independent board in May 2016) expired by May 2020," and that "CIHS's window to sue to rescind or cancel the amendments has expired."

To avoid this result, CIHS attempts to frame the first and second causes of action as premised on breaches of contract or implied covenants. But the first two causes of action are not founded on alleged violations of the lease terms or other obligations, and they do not seek a judicial declaration of breach. Rather, those causes of action allege and seek to establish that the lease amendments are "void and unenforceable." As such, the first and second causes of action do not seek declaratory relief pertaining to breach.

Additionally, the 741 Lease Amendment does not constitute an anticipatory breach of a future obligation. "Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. . . . An express repudiation is a clear, positive, unequivocal refusal to perform [citations]; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of

12

his promise impossible." (*Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1246.)[6]

Through the 741 Lease Amendment, CIHS and Myo-Sei expressly "deleted and terminated" the 741 Option. This was not an express or implied refusal to perform the option, but rather a mutual agreement to cancel it. Indeed, the 741 Option allowed amendments "in writing and signed by the party against which its enforcement is or may be sought." We therefore fail to see how the 741 Lease Amendment could be construed as an anticipatory breach.

Finally, we disagree with CIHS's assertion that a plaintiff may always assert an invalid contract formation *cause of action* in response to a defendant's new attempt at contract enforcement. CIHS relies on *Styne v. Stevens* (2001) 26 Cal.4th 42, 51–52, where the California Supreme Court held that "[u]nder well-established authority, a defense may be raised at any time, *even if the matter alleged would be barred by a statute of limitations if asserted as the basis for affirmative relief.* . . . One sued on a contract may urge defenses that render the contract unenforceable, even if the same matters, alleged as grounds for restitution after rescission, would be untimely." (Italics added.) As can be seen by the quoted language, defenses are not subject to statutes of limitations, but requests for affirmative relief like the first and second causes of action are. Indeed, "[a]ll civil actions, including actions for declaratory relief, are subject to statutes of limitations."

_____

[6] An anticipatory breach "give[s] the injured party the right to elect either to sue immediately for breach of the contract . . . or to wait until the performance is due and to then exercise his or her remedies for actual breach of the contract." (*Trilogy at Glen Ivy Maintenance Assn. v. Shea Homes, Inc.* (2015) 235 Cal.App.4th 361, 370, citation omitted.)

(*Snyder v. California Ins. Guarantee Assn.* (2014) 229 Cal.App.4th 1196, 1208.)

In sum, the allegations of the FAC demonstrate that the first and second causes of action are barred by the statute of limitations. The trial court correctly sustained the demurrer on this ground. (*Stueve Bros. Farms, LLC v. Berger Kahn* (2013) 222 Cal.App.4th 303, 321 [demurrer may be based on statute of limitations when the complaint " ' " 'clearly and affirmatively' " ' " shows the action is time barred].)

3.      Fourth Cause of Action

Relying on Myo-Sei's conduct and various provisions of the parties' agreements, CIHS argues that Myo-Sei waived its right to require prior written consent to subleases. We disagree.

First, CIHS relies on its allegation that shortly before the 741 Lease was executed, Myo-Sei agreed that CIHS could sublease the 741 Property. However, the 741 Lease contains an integration clause, stating that it "supersedes any prior agreement . . . and contains the entire agreement between the parties."

Second, CIHS cites the statement of intent in section 1 the 741 Lease, which states "at the beginning of this Lease, the number of students and faculty do not support [CIHS's] occupancy of the Leased Premises. As a result, it is agreed that CIHS may sub-lease all or a portion of the Lease Premises until it is able to occupy the entire Lease Premises." But section 15 of the 741 Lease, titled "Assignment or Subletting," states that "the right of . . . subletting was specially structured and limited," and "it is specifically agreed that Tenant shall not . . . sublease all or any part of the Leased Premises . . . without first obtaining Landlord's prior written consent."

14

When interpreting a contract, we " ' "view the language in light of the instrument as a whole[,]' " . . . give effect to every provision[, and] . . . [a]n interpretation which renders part of the instrument to be surplusage should be avoided." (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279.) Applying these principles here, section 1 does not supersede section 15. Section 1 merely describes the general intent to allow subleasing, while section 15 describes the specific rules for subleasing. Even if these two sections were interpreted as conflicting, section 15 would prevail as the more specific provision. (*California Union Square L.P. v. Saks & Co. LLC* (2021) 71 Cal.App.5th 136, 143.)

Finally, Myo-Sei's failure to previously enforce the subleasing requirements does not amount to a prospective waiver. " 'Where the conditions are continuing in their nature, such as covenants . . . against subletting without written consent, the consent to or waiver of a breach does not preclude the right of the lessor to proceed against the lessee for subsequent breaches.' " (*Extension Oil Co. v. Richfield Oil Corp.* (1942) 52 Cal.App.2d 105, 108.) Moreover, section 15 of the 741 Lease states that "[n]o consent to any . . . sublease shall constitute a further waiver of the provisions of this Section."

Based on the foregoing, the fourth cause of action fails to state a valid claim for relief.[7]

_____

[7] The fourth cause of also alleged that the subleasing provisions "were unconscionable at the time the contracts were made." CIHS does not argue this point on appeal and has therefore forfeited it. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co, supra,* 169 Cal.App.4th at p. 352.) In any event, this claim would be barred by the statute of limitations for the reasons stated in part III.A.2, *ante.*

15

4.    Fifth Cause of Action

As discussed above, the fifth cause of action is premised on allegations that Jinja consolidated Lots 13, 14, and 15 into Lot 22, and that the 701 Option references Lot 22. These allegations are inconsistent with the FAC's attachments.

First, the FAC alleges that in 1995, Jinja consolidated Lots 14 and 15 creating Lot 20, and in 1998, Jinja consolidated Lot 20 with Lot 13, creating Lot 22. These allegations conflict with the Notices of Completion for the buildings on the 701 and 741 Properties, which are attached to the FAC as Exhibit 1. The Notice of Completion for the building on the 701 Property was executed and recorded in 1996, one year after Lot 20 was allegedly created. The Notice of Completion for the building on the 741 Property was executed and recorded in 1999, one year after Lot 22 was allegedly created. Both Notices of Completion refer to "Lots 13, 14 and 15," and neither references a Lot 20 or 22. Accordingly, these Notices of Completion controvert the alleged Lot 22 consolidation.

Second, the operative provisions of the701 Lease do not refer to Lot 22. Pursuant to the 701 Lease, CIHS has the option to purchase the "Leased Premises." The 701 Lease defined "Leased Premises" as the 701 Property with assessor parcel number (APN) 257-470-20-00. According to the FAC, the 701 Lease "misidentified" the APN, which the First 701 Lease Amendment corrected by referencing APN 257-470-22-00. Based on this new APN containing the number "22," CIHS argues that the First 701 Lease Amendment identifies the "Leased Premises" as Lot 22, and that the 701 Option applies to Lot 22.

However, the Second 701 Lease Amendment contains the operative definition of the "Leased Premises" and does not mention Lot 22 or APN 257-

16

470-22-00. Instead, the premises are defined as the 701 Property as diagramed in "Exhibit 'A,' " which depicts three lots identified as 13, 14, and 15, with Lot 15 encircled and identified as the "Leased Premises."

Leaving no confusion, the 741 Lease Amendment contains the same diagram, except Lots 13 and 14 are encircled and identified as the "Leased Premises." Further clarifying the parties' agreement, the Second 701 Lease Amendment modified the 701 Option to include "an easement for vehicle and pedestrian passage over the driveways and parking areas and pedestrian passage over the sidewalks located on the premises known [sic] Lot 14 and Lot 13 as are identified on Exhibit 'A','" and to require that CIHS grant Myo-Sei "an easement for vehicle and pedestrian passage over the driveway and turn around located on Lot 15 (the Leased Premises)."

Based on these terms, the 701 Option applies to the 701 Property, with an easement over the 741 Property. Despite the alleged consolidation into a single Lot 22 and the earlier reference to APN 257-470-22-00, there is no reference to that APN or Lot 22 in the operative provisions of the 701 Lease. Instead, the parties retained the original lot designations (13, 14, & 15) when delineating their various rights and obligations. These terms directly contradict CIHS's allegations that the 701 Option covers Lot 22 as the entire CIHS campus. As such, the fifth cause of action fails.

B.     *The Trial Court Did Not Abuse Its Discretion in Denying Leave to Amend*

"When a demurrer is sustained without leave to amend, we decide whether there is a reasonable possibility that the plaintiff can amend his/her complaint to cure the defect. [Citation.] If the defect can be cured, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citation.] The burden of proving such

17

reasonable possibility is squarely on the plaintiff." (*Genis, supra,* 66 Cal.App.5th at p. 1015.)

CIHS requests leave to amend to add a new declaratory relief cause of action. This new cause of action would seek a determination that CIHS's entire campus is held in an irrevocable charitable trust which may not be revoked by a private, for-profit entity such as Myo-Sei.

This new cause of action suffers from the same flaw as the FAC's first and second causes of action. Even if the initial transactions placed the 701 and 741 Properties into a charitable trust, and even if Myo-Sei wrongfully revoked that transfer by amending the leases, that wrong and the resulting harm occurred in 1999 and 2006, and CIHS's independent board endorsed it in 2016. Accordingly, this new charitable trust cause of action would likewise be barred by the statute of limitations.

CIHS also seeks leave to amend the first and second causes of actions "to: (1) request declarations directed to the specific lease provisions the amendments purported to add or delete (rather than declarations about the amendments themselves); and (2) omit the word "void" and simply seek declarations that those provisions are "unenforceable" (rather than "void and unenforceable")." But as CIHS acknowledges, this "leav[es] the substance of the claims intact." In other words, the gravamen of these causes of action would remain the same; namely, cancellation of contract provisions based on the circumstances surrounding their execution. Accordingly, the proposed amendment would not cure the statute of limitations defect discussed above.

Finally, regarding the fourth cause of action, CIHS asserts it could strengthen its waiver claim by alleging a pre-1999 practice requiring written subleasing consent that was discontinued and intended to apply to both leases. These allegations do not overcome the leases' integration clauses,

18

which state that prior agreements are superseded, and amendments must be in writing.

Based on the foregoing, the trial court did not abuse its discretion in denying leave to amend.

## IV. DISPOSITION

The judgment is affirmed.  Myo-Sei is awarded costs on appeal.


RUBIN, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.

19